DWIGHT C. HOLTON, OSB #09054
United States Attorney
District of Oregon
SCOTT E. BRADFORD, OSB #062824
Assistant United States Attorney
405 East 8th Avenue, Suite 2400
Eugene, OR  97401
(541) 465-6771

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

(EUGENE DIVISION)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case Nos. 09-CR-60167-HO |
| | ) | 11-CR-60056-HO |
| Plaintiff, | ) | |
| | ) | GOVERNMENT'S SENTENCING |
| vs. | ) | MEMORANDUM |
| | ) | |
| DELBERT L. BARBER, JR., | ) | (Sentencing set for July 19, 2011, |
| | ) | at 10:00 am) |
| Defendant. | ) | |

The United States of America, by and through Dwight C. Holton, United States Attorney for the District of Oregon, and Scott E. Bradford, Assistant United States Attorney, respectfully submits the following sentencing memorandum which concurs with United States Probation Officer Robb's  sentencing recommendation of 27 months' incarceration and three years of supervised release and with a majority of her factual findings.  Additionally, this Court should order defendant to pay $340,745.83 in restitution to the victims of his crimes.

## INTRODUCTION

Defendant is before this Court for two cases: 09-CR-60167-HO in which defendant is charged with a variety of mortgage and loan fraud crimes; and 11-CR-60056-HO in which defendant is charged with health care fraud.  Regarding the mortgage and loan fraud charges in

case 09-CR-60167-HO, defendant is the first of several defendants in five related cases to be sentenced. On November 19, 2009, the Grand Jury returned five Indictments against 13 individuals on a variety of charges, including conspiracy, bank fraud, wire fraud, false statements to financial institutions, and money laundering.[1] The charges in the related Indictments arose out of conduct associated with Desert Sun Development, Inc., ("DSD"), a commercial and residential real estate construction and development company in Bend, Oregon. Defendant was charged in case 09-CR-60167-HO in four counts: Count One, conspiracy to commit bank fraud, loan application fraud, and wire fraud, Count 9, bank fraud, Count 14, false statement on a loan application, and Count 15, wire fraud. On June 15, 2010, defendant pleaded guilty to Count One of the Indictment, conspiracy to commit bank fraud, loan application fraud, and wire fraud in violation of 18 U.S.C. § 371.

While on pretrial release, defendant committed a new federal offense, health care fraud in violation of 18 U.S.C. § 1035(a)(2), and the government filed a one-count Information, case 11-CR-60056-HO, to which defendant is scheduled to plead guilty pursuant to a plea agreement.

## OFFENSE AND RELEVANT CONDUCT

On June 15, 2010, defendant pleaded guilty to conspiracy to commit bank fraud, loan application fraud, and wire fraud in violation of 18 U.S.C. § 371 in case 09-CR-60167-HO. On July 19, 2011, defendant is scheduled to be arraigned and to plead guilty to a health care fraud charge in violation of 18 U.S.C. § 1035(a)(2) in case 11-CR-60056-HO; an Information was filed

---

[1] The five cases are *United States v. Tyler Fitzsimons, et al.*, 09-CR-60165-HO; *United States v. Robert Brink*, 09-CR-60166; *United States v. Tyler Fitzsimons*, et al., 09-CR-60167-HO; *United States v. Michael Wilson*, 09-CR-60168-HO; and *United States v. Teresa Ausbrooks*, 09-CR-60169-HO. Six of the 13 defendants have pleaded guilty. The remaining defendants are currently set for trial on September 14, 2011. The next scheduled status hearing is on July 18, 2011, before the Honorable Thomas M. Coffin.

on April 26, 2011. Also, on July 19, 2011, defendant is scheduled to be sentenced in a consolidated sentencing hearing for the mortgage and loan fraud conspiracy and health care fraud. Offense and relevant conduct for each charge is addressed below.

      A.      Conspiracy to Commit Bank Fraud, Loan Application Fraud, and Wire Fraud

The conduct giving rise to the charges and defendant's guilty plea are described in paragraphs 21-24 of the presentence report ("PSR") and in the Statement of Facts filed on June 16, 2010. The relevant, undisputed facts for sentencing purposes are discussed below.

In 2006, defendant was a licensed mortgage broker and owned and operated Pine Mountain Mortgage in Bend, Oregon. At that time, DSD principals approached defendant to process loans for borrowers who were planning to purchase DSD-built homes in a flipping scheme. While processing some of these loans, defendant learned that DSD was going to subsidize or pay the borrowers' mortgage payments until the houses could be flipped. Defendant also learned that DSD was providing the borrowers with money for the down payment and cash required to close the loan. In either instance, whether DSD subsidized or paid the mortgage payments or supplied the down payment, the borrowers were required to repay DSD when the houses were flipped. Eventually, defendant became involved in DSD's fraudulent flipping scheme.

Specifically, defendant brokered a loan for DSD borrowers when he knew that DSD provided the borrowers with approximately $125,000 to close their loan. Defendant knew that it was a condition of final approval for funding that the $125,000 be the borrowers' own funds. Despite this knowledge, defendant prepared the borrowers' home loan application, Form 1003, falsely representing that the $125,000 was the borrowers own funds, when, in fact, the $125,000 was a loan from DSD. Defendant also knowingly caused the borrowers' final closing statement

GOVERNMENT'S SENTENCING MEMORANDUM - Page 3

or HUD-1 to falsely misrepresent the true ownership of $125,000. Defendant knew he was under an obligation to inform the lender of this materially false statement, and he did not do so. Based on defendant's fraudulent conduct, including the material misrepresentations, the loan funded. Because the borrowers would have been unable to afford the home but for the fraud, the lender eventually foreclosed on the house.

Defendant also brokered two loans for Michael Wilson, another DSD borrower, who was charged in a related case, 09-CR-60168-HO, and who pleaded guilty to bank fraud as a result of participating in DSD's flipping scheme. For brokering the three loans, defendant earned more than $34,000.

B.   Health Care Fraud

While on pretrial release and after pleading guilty in case 09-CR-60167-HO, defendant committed a new federal offense, health care fraud in violation of 18 U.S.C. § 1035(a)(2). As described in paragraphs 25-26 of the PSR, defendant crashed his motorcycle after he let his insurance lapse. In order to avoid financial responsibility for his medical care, defendant attempted to fraudulently reinstate his medical insurance by faxing his insurance provider a fraudulent letter and check, claiming that he had made his payments and that his insurance had not lapsed. After his claim for reinstatement was denied, defendant engaged in a pattern of harassment and fraud, including making threatening phone calls and harassing visits to his insurance provider, submitting additional fraudulent documents to his insurance provider, and filing a frivolous lawsuit against his insurance provider in state court.

C.   Other Relevant Conduct

Aside from the conduct described above, defendant engaged in other acts that merit this Court's consideration in fashioning a reasonable sentence. First, as part of his plea agreement in

GOVERNMENT'S SENTENCING MEMORANDUM - Page 4

case 09-CR-60167-HO, defendant agreed to cooperate with the government. In his initial cooperation, defendant provided actionable information regarding other individuals involved in mortgage fraud in Bend, Oregon. However, after providing the information, defendant called at least one of these individuals and warned the individual of potential law enforcement action and thereby obstructing a potential investigation.

Second, aside from committing health care fraud while on pretrial release, defendant engaged in a pattern of thuggish behavior that eventually led to his pretrial detention. While on pretrial release and after pleading guilty in 09-CR-60167-HO, defendant physically threatened several individuals, including his ex-wife, individuals he thought his ex-wife was dating, and employees of his insurance provider. The threats consisted of phone calls, texts, and, perhaps most disturbing, personal confrontations. On multiple occasions, Pretrial Services Officer Stranieri and Magistrate Judge Thomas M. Coffin ordered defendant to stop threatening individuals. Defendant continued his threatening conduct, and Magistrate Judge Coffin issued a warrant for defendant's arrest. When confronted by the government regarding the threats, defendant lied. Magistrate Judge Coffin revoked his pretrial release and ordered him detained.[2]

Finally, defendant is a self-proclaimed bully, who blames others for his criminal behavior, and resorts to intimidation and self-destructive and violent behavior when things do not go his way. (PSR ¶ 57). As previously mentioned above, defendant has attempted to obstruct a federal investigation, committed a new offense while on pretrial release, threatened individuals, and defied Magistrate Judge Coffin's orders. Defendant presents an economic and physical danger to the community and himself.

---

[2] It is unclear why this information was omitted from the PSR.

GOVERNMENT'S SENTENCING MEMORANDUM - Page 5

## OFFENSE LEVEL AND CRIMINAL HISTORY

Because this is a consolidated sentencing hearing, grouping rules under United States Sentencing Guidelines ("U.S.S.G.") § 3D1.2 likely apply. As noted in the PSR and the plea agreement, probation and the parties agree that the following U.S.S.G. provisions apply:

- Pursuant to U.S.S.G. § 2B1.1(a)(2), defendant's base offense level is six;

- Pursuant to U.S.S.G. § 3B1.2, because defendant's role in the offense was minor, a two-level reduction applies;

- Pursuant to U.S.S.G. § 3B1.3, because defendant abused his position of trust or special skill, a two-level increase applies;

- Pursuant to U.S.S.G. § 3C1.3, because defendant committed health care fraud while on release for the mortgage and loan fraud charges, a three-level increase applies; and

- Pursuant to U.S.S.G. § 3E1.1, because defendant accepted responsibility for his criminal conduct, a single three-level reduction applies.

Probation and the parties also agree that defendant's Criminal History Category is I. Probation and the parties further agree that the loss for the health care fraud violation is $100,697.86. Probation and the parties disagree on the loss for the conspiracy. Probation and the government assert the loss for the conspiracy as related to this defendant is $202,151.40; at this time, defendant's position is unclear.[3]

---

[3] The government's current recommendation differs slightly from the loss recommended in the PSR, $202,151.40 vs. $222,184.32, because the government recently received new information that affected the loss calculation, which has been provided to defense counsel and probation. Because the loss recommended in the PSR was based on the government's prior submission, the government infers probation would concur with the government's new loss calculation. Moreover, the new loss figure was reduced in defendant's favor.

Typically, the loss calculation in financial fraud cases is controlled by U.S.S.G. § 2B1.1(b)(1), and a sentencing court need only make a reasonable estimate of the actual losses. U.S.S.G. § 2B1.1, App. Note 3(C). "The guidelines do not present a single universal method for loss calculation under § 2B1.1—nor could they, given the fact-intensive and individualized nature of the inquiry." *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir.2007). In calculating the loss, sentencing courts should "'take a realistic, economic approach to determine what losses the defendant truly caused or intended to cause, rather than the use of some approach which does not reflect the monetary loss.'" *See United States v. Stoddard*, 150 F.3d 1140, 1145-46 (9th Cir. 1998) (quoting *United States v. Allison*, 86 F.3d 940, 943 (9th Cir.1996)).

In the instant case, the parties do not dispute that § 2B1.1(b)(1) controls, and three application notes in § 2B1.1(b)(1) are particularly helpful in determining the appropriate amount of the loss. First, Application Note 3(A)(i) explains that actual loss, which is the issue here, is "the reasonably foreseeable pecuniary harm that resulted from the offense." Second, Application Note 3(A)(iv) defines reasonably foreseeable pecuniary harm as harm that is monetary or that is otherwise measurable in money "that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." Finally, Application Note 3(E)(ii) clarifies that in a case involving pledged collateral the loss shall be reduced by "the amount the victim has recovered at the time of sentencing from disposition of the collateral."

In a recent opinion, the United States District Court for the Eastern District of Virginia applied these Application Notes to determine the loss in a similar context. In *United States v. Mallory*, 709 F.Supp.2d 455, 458 (E.D. Va. 2010), the court explained that the Application Notes discussed above "teach a two-step approach for calculating the loss attributable to a defendant in

GOVERNMENT'S SENTENCING MEMORANDUM - Page 7

home loan fraud cases." The court noted that "[t]he first step is to calculate the reasonably foreseeable pecuniary harm resulting from the fraud." *Id.* The court reasoned that "this amount will almost invariably include the full amount of unpaid principal on the fraudulently obtained loan, as an unqualified borrower's default is clearly a reasonably foreseeable potential result of the offense within the meaning of Application Note 3(A)(iv)." *Id.* (internal quotations omitted). The court clarified that the risks associated with the loan would not have been "assumed by the lender in the absence of fraud," and, as such, "the loss of the unpaid principal is an eminently foreseeable consequence of the fraudulent conduct." *Id.*

Applying step one to this case, defendant admitted as part of his plea agreement that he knowingly prepared and submitted a home loan application to a lender that contained materially false statements and thereby caused that lender to fund a loan for unqualified borrowers. At that time, defendant was a licensed mortgage broker, a gatekeeper of sorts, who was supposed to stop this type of fraud rather than willingly participate in it. As such, the loss of the unpaid principal for the loan at issue constitutes the reasonably foreseeable pecuniary harm because, absent defendant's fraudulent conduct, the lender would not have assumed the risks associated with issuing the loan. According to the lender's records, the unpaid principal balance was $446,654.70. (See Attachment A).

The second step for calculating the loss attributable to a defendant in home loan fraud cases requires that the loss be reduced by the amount the victim has recovered at the time of sentencing from the disposition of any pledged collateral. *Mallory*, 709 F.Supp.2d at 458. In *Mallory*, the court explained that this calculation is made at the time of sentencing regardless of whether the amount recovered was reasonably foreseeable by the defendant. *Id.* Aside from finding that a plain reading of § 2B1.1(b)(1) required such an approach, the court reasoned that

GOVERNMENT'S SENTENCING MEMORANDUM - Page 8

factors such as economic or market downturns should not be used to offset any loss because a defendant in home loan fraud cases (1) caused the lender by virtue of the defendant's material misstatements to assume the risk of an economic or market downturn with respect to the pledged property, and (2) through his fraudulent conduct "played a substantial and reasonably foreseeable role in the market downturn." *Id.*

Here, the lender received $244,503.30 for the property through the foreclosure process, which resulted in an actual loss of $202,151.40 ($446,654.70 less $244,503.30) for the mortgage and loan fraud conspiracy. (See Attachment A). Accordingly, the combined loss for both offenses is $302,849.26, $100,697.86 for the health care fraud charge and $202,151.40 for the mortgage and loan fraud conspiracy, resulting in a 12-level increase to defendant's U.S.S.G. Offense Level. With a Total Offense Level of 18 and a Criminal History Category of I, defendant's advisory U.S.S.G. range is 27-33 months.

## 18 U.S.C. § 3553(a) FACTORS

In this case, a 27-month term of incarceration is appropriate and reasonable based on the factors outlined in 18 U.S.C. § 3553(a)–that is, this sentence contemplates the nature and circumstances of the offense and the history and characteristics of the defendant, reflects the seriousness of the offense, promotes respect for the law, provides just punishment for the offense, affords adequate deterrence to criminal conduct, and protects the public from further crimes of the defendant.

Defendant conspired to, and did, commit bank fraud, committed health care fraud while on pretrial release, and otherwise defied Magistrate Judge Coffin's orders while on pretrial release, which led to his pretrial detention. These facts, as well as those discussed in more detail above and in the PSR, demonstrate that a 27-month sentence is needed to, among other things,

GOVERNMENT'S SENTENCING MEMORANDUM - Page 9

reflect the seriousness of defendant's offenses, promote respect for the law, provide just punishment for the offenses, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant.

## RESTITUTION

As part of his plea agreements and pursuant to 18 U.S.C. § 3663A, the Mandatory Victim Restitution Act ("MVRA"), defendant agreed to pay restitution as determined by this Court. Restitution under the MVRA can differ from the loss used for U.S.S.G. purposes. In fact, the MVRA does not address the loss for U.S.S.G. calculations. *See United States v. Gordon*, 393 F.3d 1044, 1052-53 (9th Cir. 2004) (discussing the different purposes of the Sentencing Guidelines and the MVRA); *United States v. Stoupis*, 530 F.3d 82, 84-85 & n.4 (1st Cir.2008) (recognizing that "'value' for MVRA purposes is distinct from 'loss' for Sentencing Guidelines purposes" and commenting on U.S.S.G. § 2B1.1 cmt. n. 3(C)(I)). The MVRA makes restitution mandatory for offenses involving fraud or deceit without consideration of a defendant's economic circumstances and includes losses directly resulting from a defendant's criminal conduct relating to both the count of conviction and dismissed counts or relevant conduct. 18 U.S.C. § 3663A(a)(1), (a)(2), and (c)(1)(A)(ii);18 U.S.C. § 3664(f)(1)(A); *United States v. Andrews*, 600 F.3d 1167, 1170-71 (9th Cir. 2010); *United States v. Bright*, 353 F.3d 1114, 1120-21 (9th Cir. 2004). "The purpose of restitution is to put the victim back in the position he or she would have been but for the defendant's criminal conduct." *United States v. Gossi*, 608 F.3d 574, 581 (9th Cir. 2010).

Restitution for the health care fraud charge appears to be uncontested and is rather straightforward to calculate: it is $100,697.86, the amount defendant owes his victims of that offense. Restitution for the mortgage fraud conspiracy requires other considerations.

GOVERNMENT'S SENTENCING MEMORANDUM - Page 10

In mortgage fraud cases such as this one, the MVRA requires that restitution "must be calculated as the unpaid balance on the loan, minus the value of the collateral at the date the victim bank gained control of the collateral, plus the bank's expenses prior to the same date." *Gossi*, 608 F.3d at 580 (internal quotations and citation omitted) (noting that the MVRA and the Victim Witness Protection Act ("VWPA") are virtually identical); *see also* 18 U.S.C. § 3663A(b)(1)(B)(II) and (b)(1)(B)(ii); *United States v. Catherine*, 55 F.3d 1462 (9th Cir. 1995) (interpreting the VWPA). In fraudulent loan cases, even unpaid interest is considered a loss for restitution purposes because it "is not speculative and is the raison d'etre for the loan." *United States v. Davoudi*, 172 F.3d 1130, 1136 (9th Cir. 1999).

Here, as previously mentioned, the unpaid principal balance on the home loan was $446,654.70 and was relatively easy to determine–that is, the principal balance of the loan less any payments made to principal. (See Attachment A). However, determining the value of the property on the date it was returned to the victim bank, Bank of America, is more difficult; there are three potential values. First, on April 12, 2010, when the lender had control of the home, it was valued at $330,000. Second, on May 19, 2010, the lender attempted to sell the home through the foreclosure process "on the courthouse steps" and, without any bidders, assumed the property through a subsidiary at a value of $294,300. Finally, when the home actually sold through the foreclosure process, the lender valued the home at $327,000. Based on the government's requests, it appears prior valuations are nonexistent.

Application of *Gossi* and related cases to the present case results in restitution in the amount of $240,047.97 for the mortgage and loan fraud conspiracy for this defendant–that is, $446,654.70, the unpaid principal balance for the home, minus $330,000, the earliest and highest known value for the home after which the victim bank had gained control of it, plus

GOVERNMENT'S SENTENCING MEMORANDUM - Page 11

$123,393.27, the victim bank's expenses near that point. *Id.*

Based on the foregoing, defendant should be ordered to pay $340,745.83 in restitution, $100,697.86 to the victims of his health care fraud and $240,047.97 to the victim of his mortgage fraud.

## CONCLUSION

Based on the foregoing, the plea agreement, Statement of Facts, and the PSR, the government submits a reasonable sentence for this defendant in this case is 27 months' incarceration to be followed by a three-year term of supervised release. Additionally, the Court should order defendant to pay $340,745.83 in restitution to the victims of his crime.

DWIGHT C. HOLTON
United States Attorney
District of Oregon


*/s/ Scott E. Bradford*
SCOTT E. BRADFORD
Assistant United States Attorney